Joseph G. Sansone
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0517
sansonej@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| WOOJAE (STEVE) JUNG, | |
| Defendant, and | |
| SUNGROK HWANG, | |
| Relief Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## SUMMARY

1.      This action involves serial insider trading by defendant Woojae (Steve) Jung, an

investment banking executive at a prominent investment bank (the "Investment Bank").  During the

course of his employment, Jung obtained access to sensitive information about impending

transactions in which the Investment Bank was advising one of the parties.  Between at least

February 2015 and July 2017, Jung misappropriated that highly-confidential information to trade in

the securities of 12 different companies prior to the public announcement of the transactions.  Jung

attempted to conceal his connection to the trading by purchasing the securities in a brokerage account held in the name of a friend living in South Korea, relief defendant Sungrok Hwang ("Hwang"). Over the course of the scheme, Jung generated illegal profits of more than $140,000. By engaging in this misconduct, Jung violated the antifraud provisions of the federal securities laws.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

2.       The SEC brings this action under the authority conferred on it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

3.       The SEC seeks a permanent injunction against defendant Jung, enjoining him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. The SEC also seeks disgorgement of all ill-gotten gains from that illegal trading, along with prejudgment interest, from relief defendant Hwang. The SEC further seeks any other equitable relief the Court may determine to be just and necessary pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

4.       This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

5.       Venue lies in this Court pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national

securities exchange.  The Investment Bank is headquartered in this judicial district and Jung worked at its office within this judicial district when certain of the illicit trades occurred.  In addition, the securities involved in the illicit trades were listed on the New York Stock Exchange ("NYSE") and the NASDAQ stock exchange, which are both headquartered in this judicial district.

## DEFENDANT

6.      Woojae (Steve) Jung, age 37, is a Korean citizen and resides in San Francisco, California.  Jung worked in the Investment Bank's New York office as an investment banking associate from approximately July 2012 through July 2015.  Since then, Jung has worked in the Investment Bank's San Francisco office as a vice president in investment banking.  Jung holds a Series 79 license.  He attended Seoul National University and obtained an MBA in May 2012.

## RELIEF DEFENDANT

7.      Sungrok Hwang, age 38, is a Korean citizen who resides, on information and belief, in Seoul, South Korea.  Like Jung, Hwang attended Seoul National University.  Hwang and Jung are friends, and since attending the same school have stayed in contact by phone and on social media.

## RELEVANT ENTITIES

8.      The Investment Bank, a registered broker-dealer and investment adviser, is headquartered in New York, New York.

9.      Jung traded in the securities of at least 12 publicly traded companies identified below (the "Companies") in advance of announcements of the involvement of these Companies in transactions advised by the Investment Bank.  Those transactions primarily concerned actual or contemplated mergers, acquisitions, and tender offers.  Each Company's stock or units were registered with the Commission under Section 12(b) of the Exchange Act.

10.      CA Inc. ("CA") is a software company headquartered in New York, New York and

its stock trades on the NASDAQ under the symbol CA.

11.     FEI Company ("FEI") is a Hillsboro, Oregon-headquartered supplier of scientific instruments for nanoscale applications in industry and science and its common stock traded on the NASDAQ until approximately September 19, 2016 under the symbol FEIC.

12.     Fairchild Semiconductor International Inc. ("Fairchild") was a semiconductor company based in Sunnyvale, California and its common stock traded on the NASDAQ, under the symbol FCS, until approximately September 19, 2016.

13.     Foresight Energy LP ("Foresight") is a mining company headquartered in Saint Louis, Missouri and its common units trade on the NYSE under the symbol FELP.

14.     Gigamon Inc. ("Gigamon") is a computer networking company based in Santa Clara, California and its common stock traded on the NYSE under the symbol GIMO until approximately December 27, 2017.

15.     KLA-Tencor Corporation ("KLA-Tencor") is a Milpitas, California-based semiconductor equipment manufacturer and its common stock trades on the NASDAQ under the symbol KLAC.

16.     Microsemi Corporation ("Microsemi") is a semiconductor company headquartered in Aliso Viejo, California and its common stock trades on the NASDAQ under the symbol MSCC.

17.     Nimble Storage Inc. ("Nimble") is a San Jose, California-headquartered computer storage and software technology company and its common stock traded on the NYSE until approximately April 17, 2017, under the symbol NMBL.

18.     NXP Semiconductors N.V. ("NXP") is another semiconductor company; NXP is headquartered in the Netherlands.  NXP's common shares trade on the NASDAQ under the symbol NXPI.

19.     SanDisk Corporation ("SanDisk") was a flash storage technology company headquartered in Milpitas, California and its common stock traded on the NASDAQ until approximately May 12, 2016, under the symbol SNDK.

20.     WebMD Health Corp. ("WebMD") is a provider of online health information services headquartered in New York, New York and its common stock traded on the NASDAQ under the symbol WBMD until approximately September 15, 2017.

21.     W.R. Grace & Co. ("W.R. Grace") produces and sells specialty chemicals and materials.  W.R. Grace is headquartered in Columbia, Maryland and its common stock trades on the NYSE under the symbol GRA.

## FACTUAL ALLEGATIONS

**A.     The Investment Bank's Policies on Confidential Information and Personal Trading**

22.     As an investment banking executive, Jung had access to material nonpublic information about impending business transactions involving companies advised by the Investment Bank through his direct involvement working on these transactions, through his access to the Investment Bank's files, or through contact with co-workers staffed on the transactions.

23.     All personnel of the Investment Bank were subject to an internal compliance policy entitled, "Policies Regarding the Safeguarding of Confidential Information, the Chinese Wall and Other Information Barriers" ("[Investment Bank] Confidential Information Policy"), which explicitly stated that:

> We regularly receive confidential information as part of our normal client relationships.  To breach a confidence or to use confidential information improperly or carelessly would be unthinkable.

24.     The Investment Bank Confidential Information Policy prohibited firm employees from trading on the basis of material nonpublic information obtained in the course of their work:

Inappropriate use or disclosure of any potential material nonpublic information that personnel receive could have serious consequences for personnel and the firm, including disciplinary action or potential civil or criminal liability …

Personnel must maintain the confidentiality of any potential material nonpublic information received and may use it only for the business purposes for which it was disclosed …

Personnel are restricted from transacting, and/or directing others to transact in, the securities of the entity(ies) about which they have potential material nonpublic information … for their personal or related accounts[,]

25.     All personnel of the Investment Bank were also subject to an internal compliance policy entitled, "Personal Trading" ("Personal Trading Policy"), which generally prohibited employees from holding outside brokerage accounts.  And even in those limited circumstances where an outside account was permitted, the Investment Bank personnel had to disclose the outside account and also pre-clear all trades with the Investment Bank.  The restrictions set forth in the Personal Trading Policy are all based on the principle that trading by employees must "comply with all applicable regulations, including, but not limited to, those regarding insider trading and manipulative practices[.]"

26.     All of the Investment Bank's employees were provided with training on the firm's Confidential Information Policy and Personal Trading Policy.

**B.     Jung Attempts to Conceal His Activity by Using His Friend's Brokerage Account**

27.     Jung joined the Investment Bank in July 2012.  At the time, he held a trading account in his own name at Interactive Brokers LLC ("Interactive Brokers").  But as mandated by the Personal Trading Policy, Jung began the process of closing his Interactive Brokers account in September 2012.  Jung then opened a new brokerage account at Fidelity Brokerage Services LLC ("Fidelity"), which was an outside brokerage firm approved by the Investment Bank.  The Investment Bank directly received copies of Jung's Fidelity account statements, reflecting his

trading in that account, as required by the Investment Bank's Personal Trading Policy.

28.     However, on August 8, 2012, a second Interactive Brokers trading account was opened in the name of Jung's friend, relief defendant Hwang (the "Hwang Account").

29.     Jung was not registered as a financial adviser, or other person authorized to access the Hwang Account.  Jung nonetheless left his electronic fingerprints on the Hwang Account.

30.     In the months leading up to and during the course of the insider trading scheme alleged in this Complaint, Jung exercised control over the Hwang Account, accessed the account on hundreds of occasions, and used the account to, directly or indirectly, place illegal trades.

31.     Trades in the Hwang Account were placed through Interactive Brokers' electronic trading system.  In order to place a trade through the Interactive Brokers electronic trading system, a user must first log in to the system using a unique login name and password associated with the account.  And when a user successfully logs in to an Interactive Brokers account, the firm's computer server records the internet protocol address ("IP address") used by the user.

32.     An IP address is a string of numbers that identifies how a particular computer or device accesses the Internet.  Every computer or device, whether it is a Web server, laptop computer, or smartphone, requires an IP address to connect to the Internet.  The IP address reflects how a device, such as a computer or smartphone, accesses the Internet.  For example, if someone uses their laptop while at home, they may use the IP address assigned by the Internet Service Provider ("ISP"), such as Verizon or AT&T, which provides Internet service to their residence.

33.     Jung was the registered Verizon internet subscriber for the IP address 96.250.86.82.

34.     Jung was the registered Verizon internet subscriber for the IP address 108.46.157.109.

35.     Jung was the registered AT&T internet subscriber for the IP address 71.145.208.86.

36.     Jung used the three IP addresses that were registered to him and at least ten other IP addresses that accessed the Fidelity account that Jung opened after starting his employment at the Investment Bank, to access the Hwang Account.  On some occasions, the same IP address logged in to Jung's Fidelity account and the Hwang Account on the same date and the log ins occurred within a few minutes or hours of one another.

37.     In many instances, including those detailed in Section C. below, Jung accessed the Hwang Account on the very same days that the account placed the illicit trades at issue in this action.  Jung's three IP addresses collectively accessed the Hwang Account more than 600 times.

38.     In addition to directly or indirectly placing trades in the Hwang Account, Jung was also involved in arranging for transfers or attempted transfers of money into and/or out of the Hwang Account.  For example:

39.     In February 2014, an apparent relative of Jung who lived at Jung's residential address in New York, New York deposited $7,000 into the Hwang Account.

40.     In May 2015, one of Jung's former co-workers, for whom Jung had posted a professional recommendation on the LinkedIn platform, deposited $19,000 into the Hwang Account.  The day after this transfer, Jung, using an IP address with a history of logging in to Jung's Fidelity account, logged in to the Hwang Account.

41.     In early July 2016, an attempt was made to transfer $5,600 out of the Hwang Account to a bank account held by a friend of Jung.  Interactive Brokers rejected that request as an improper transfer to a third-party account.  Then, on July 10, an individual purporting to be Hwang called Interactive Brokers to inquire about the failed transfer.  That call was placed from a cell phone number registered to Jung.

**C.     Jung's Illegal Trading**

42.     During a more than two-year period from February 2015 through July 2017, Jung,

directly or indirectly, used the Hwang Account to surreptitiously trade in advance of news of at least 12 different market-moving corporate transactions that he had either worked on at the Investment Bank, or had learned of during the course of his employment with the firm.

### 1.    Insider Trading in W.R. Grace

43.    In late-2014, W.R. Grace was engaged in nonpublic discussions to separate into two independent, publicly traded companies.

44.    The Investment Bank served as W.R. Grace's financial adviser on the contemplated transaction.

45.    Jung worked on the contemplated transaction, which he became aware of on or about November 10, 2014.

46.    Jung electronically accessed files that the Investment Bank maintained concerning the W.R. Grace transaction on February 3 and February 4, 2015.

47.    While in possession of material nonpublic information about the impending W.R. Grace transaction, Jung, directly or indirectly, purchased or directed others to purchase W.R. Grace securities in the Hwang Account.

48.    On the morning of February 4, 2015, Jung, using an IP address that had a history of logging in to Jung's Fidelity account, logged in to the Hwang Account and later that day placed orders to purchase 5 out-of-the-money W.R. Grace call options set to expire on March 20, 2015.[1]

49.    The following day, February 5, 2015, W.R. Grace publicly announced its plan to break the company into two publicly traded companies.  Following the announcement, W.R.

---

[1] A call option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified "strike price" within a specific time period.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.  If the call option's strike price is above the price at which the stock is trading, the call option is considered to be "out-of-the-money."

Grace's stock price increased by approximately 12%.

50.     After the announcement, Jung sold the W.R. Grace call option position in the Hwang Account for profits of approximately $3,000. Jung initiated the sale orders using an IP address that had a history of logging in to Jung's Fidelity account.

### 2.     Insider Trading in Foresight

51.     In spring 2015, Murray Energy Corporation ("Murray Energy") was engaged in nonpublic discussions to acquire a controlling interest in Foresight.

52.     The Investment Bank acted as a joint-book running manager for Murray Energy in connection with the contemplated transaction.

53.     Jung worked on the contemplated transaction, which he became aware of by at least March 12, 2015.

54.     On March 12 and 13, 2015, Jung electronically accessed files that the Investment Bank maintained concerning the Foresight transaction.

55.     While in possession of material nonpublic information about the impending Foresight transaction, Jung, directly or indirectly, purchased or directed others to purchase Foresight securities in the Hwang Account.

56.     On the morning and afternoon of March 13, 2015, Jung, using an IP address that had a history of logging in to Jung's Fidelity account, logged in to the Hwang Account. Later that day, the Hwang Account purchased 400 shares of Foresight stock.

57.     On the evening of March 15, 2015, Murray Energy announced that it had entered into a definitive agreement to acquire a controlling interest in Foresight. Following the announcement, the company's stock price increased by approximately 12%.

58.     On March 20, 2015, the Hwang Account sold its Foresight stock for a profit of approximately $900. After the Foresight sales occurred that day, Jung, using an IP address that had

a history of logging in to Jung's Fidelity account, logged in to the Hwang Account.

### 3.  Insider Trading in SanDisk

59.     In fall 2015, SanDisk was engaged in nonpublic discussions concerning its potential acquisition by Western Digital Corp. ("Western Digital").

60.     The Investment Bank advised SanDisk in connection with the contemplated transaction.

61.     Jung worked on the contemplated transaction, which he became aware of on or about June 25, 2015.

62.     In early September 2015 and throughout October 2015, Jung electronically accessed files that the Investment Bank maintained concerning the SanDisk transaction.

63.     While in possession of material nonpublic information about the impending SanDisk transaction, Jung, directly or indirectly, purchased or directed others to purchase SanDisk securities in the Hwang Account.

64.     Between August 26 and October 19, 2015, the Hwang Account bought 310 shares of SanDisk common stock and two series of out-of-the-money SanDisk call options set to expire on November 20, 2015.  On August 26, September 29, October 5, October 15, and October 19, 2015, dates when the Hwang Account traded SanDisk stock and/or options, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.

65.     On October 13, 2015, a newspaper reported that SanDisk was in talks to be acquired by another company, and on October 21, 2015, SanDisk publicly announced that it would be acquired by Western Digital.  SanDisk's stock price rose approximately 11% and 2%, respectively, after those two events.

66.     After the October 13, 2015 article, the Hwang Account sold certain of its SanDisk call options for a profit.  After the October 21, 2015 announcement, the Hwang Account sold its

SanDisk stock for a profit. In total, the Hwang Account's illegal SanDisk stock and options trades generated profits of approximately $40,000.

### 4.   Insider Trading in KLA-Tencor

67.    In fall 2015, KLA-Tencor was engaged in nonpublic discussions concerning its potential acquisition by Lam Research Corporation ("Lam Research").

68.    By at least mid-May 2015, Lam Research had retained the Investment Bank as its financial adviser in connection with the potential transaction and members of the Investment Bank's San Francisco office were aware of the potential transaction.

69.    While in possession of material nonpublic information about the impending KLA-Tencor transaction, Jung, directly or indirectly, purchased or directed others to purchase KLA-Tencor securities in the Hwang Account.

70.    On the morning of October 20, 2015, Jung, using an IP address that had a history of logging in to Jung's Fidelity account, logged in to the Hwang Account. Later that morning, the Hwang Account bought 100 out-of-the-money KLA-Tencor call options, set to expire on November 20, 2015. After the purchases, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.

71.    On the morning of October 21, 2015, KLA-Tencor publicly announced that it would be acquired by Lam Research. KLA-Tencor's stock price rose by nearly 19% after the announcement.

72.    Also on the morning of October 21, 2015, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account. Later that day and on October 22, 2015, the Hwang Account sold all of its KLA-Tencor call options for profits of approximately $64,000.

### 5.   Insider Trading in Fairchild

73.    In fall 2015, Fairchild was engaged in nonpublic discussions to sell itself.

74.     In or around mid-May 2015, Fairchild contacted the Investment Bank about acquisition interest it had received from a potential acquirer. By at least May 26, 2015, Fairchild retained the Investment Bank as its financial adviser and members of the Investment Bank's San Francisco office were aware of the potential transaction.

75.     Between June and November 2015, Fairchild and potential acquirers engaged in negotiations relating to a potential transaction, including executing confidentiality agreements, conducting due diligence, and exchanging proposals. Employees of the Investment Bank were involved in these discussions.

76.     While in possession of material nonpublic information about the potential Fairchild transaction, Jung, directly or indirectly, purchased or directed others to purchase Fairchild securities in the Hwang Account.

77.     From October 27 to November 13, 2015, the Hwang Account purchased 200 shares of Fairchild common stock and two series of out-of-the-money Fairchild call options, set to expire on December 18, 2015 and January 15, 2016.

78.     On the morning of October 27, 2015, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account. Later that day, the Hwang Account began purchasing Fairchild stock and options.

79.     On November 13, 2015, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account and placed an order to purchase out-of-the-money Fairchild call options set to expire in December 2015.

80.     On November 18, 2015, Fairchild announced that it would be acquired by ON Semiconductor Corp. through a tender offer. Fairchild's stock price increased by approximately 8.5% following the November 18, 2015 announcement.

81.     On November 18, 2015, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account and placed orders to sell the Fairchild securities. The Hwang Account sold the Fairchild stock and one of the series of options that it had acquired for profits of approximately $900.

**6.     Insider Trading in FEI**

82.     In spring 2016, Thermo Fisher Scientific Inc. ("Thermo Fisher") was engaged in nonpublic discussions to acquire FEI.

83.     On or about February 4, 2016, FEI contacted the Investment Bank about retaining it as a financial adviser in connection with the potential transaction. Members of the Investment Bank's San Francisco office were staffed to the deal and worked on or were aware of the potential transaction by at least February 4, 2016. The Investment Bank then negotiated an engagement letter with FEI and by at least March 21, 2016 was involved in substantive discussions relating to Thermo Fisher's proposal to acquire FEI.

84.     While in possession of material nonpublic information about the potential FEI transaction, Jung, directly or indirectly, purchased or directed others to purchase FEI securities in the Hwang Account.

85.     Between May 18 and May 25, 2016, the Hwang Account bought 450 shares of FEI common stock.

86.     On the morning of May 18, 2016, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account. Later that day, the Hwang Account purchased 300 shares of FEI common stock.

87.     On the morning of May 25, 2016, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account. Later that day, the Hwang Account purchased 150 shares of FEI common stock.

88.     On May 27, FEI announced that it was being acquired by Thermo Fisher, and following the announcement, FEI's stock price increased by over 14%.

89.     Following the announcement, the Hwang Account sold all of its FEI stock for profits of over $8,000.

### 7.     Insider Trading in NXP

90.     In fall 2016, Qualcomm, Inc. ("Qualcomm") was engaged in nonpublic discussions to acquire NXP.

91.     The Investment Bank advised Qualcomm in connection with the potential transaction.

92.     Qualcomm first contacted the Investment Bank in connection with the potential transaction on or about February 29, 2016.  By at least March 2016, Qualcomm retained the Investment Bank and members of Investment Bank's San Francisco office were aware of Qualcomm's proposed transaction with NXP.

93.     In early April 2016, Qualcomm and a subsidiary of NXP entered into a confidentiality agreement for purposes of discussing the potential acquisition.  During the course of April and early May 2016, the Investment Bank employees working on the proposed transaction assisted Qualcomm with evaluating NXP's business and participated in meetings with Qualcomm and NXP management.

94.     While in possession of material nonpublic information about the potential NXP transaction, Jung, directly or indirectly, purchased or directed others to purchase NXP securities in the Hwang Account.

95.     Between May 18 and October 21, 2016, the Hwang Account purchased 180 shares of NXP common stock and two series of out-of-the-money NXP call options.

96.     On May 18, 2016, the Hwang Account purchased NXP stock and call options.  Prior

to the purchases, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.  On the evening of May 18, 2016, after the purchases were executed, Jung, using an IP address that had a history of logging in to Jung's Fidelity account, logged in to the Hwang Account.

97.     On September 19, 2016, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account and purchased additional shares of NXP.

98.     On September 29, 2016, a newspaper reported that Qualcomm was in talks to acquire NXP; NXP's stock price increased by nearly 17% after the article.  And on October 27, 2016, the company formally announced that it would be acquired through a tender offer by one of Qualcomm's subsidiaries.

99.     Shortly after the formal announcement of the acquisition, the Hwang Account sold its NXP stock for profits of approximately $2,900.

**8.     Insider Trading in Microsemi**

100.     In fall 2016, Microsemi was engaged in nonpublic discussions to sell itself.

101.     On or about September 11, 2016, Microsemi contacted the Investment Bank after it had received an initial acquisition offer from Skyworks Solutions Inc. ("Skyworks").  Employees of the Investment Bank's San Francisco office were aware of the potential transaction by at least September 11, 2016.

102.     While in possession of material nonpublic information about the potential Microsemi transaction, Jung, directly or indirectly, purchased or directed others to purchase Microsemi securities in the Hwang Account.

103.     On September 12, 2016, the Hwang Account bought 125 shares of Microsemi common stock.

104.     On or about September 14, 2016, representatives of the Investment Bank attended a

16

Microsemi board of directors meeting and presented on the feasibility of the acquisition proposal that Microsemi had received from Skyworks.  Shortly after that meeting, Microsemi informed the Investment Bank that the Investment Bank was not being retained to advise on the potential transaction.

105.    On or about September 28, 2016, Skyworks contacted the Investment Bank about serving as its financial adviser in submitting a revised proposal to acquire Microsemi.  Throughout September and October 2016, representatives of the Investment Bank held meetings with Skyworks and Microsemi.

106.    On October 21, 2016, it was reported that Microsemi was engaged in talks about its potential acquisition and the company's stock price increased by over 3% that day.

107.    On the evening of November 2, 2016, a newspaper reported that Microsemi had received an acquisition proposal from Skyworks; Microsemi's stock price increased by nearly 15% after the report.

108.    On November 4, 2016, the Hwang Account sold its Microsemi stock for profits of approximately $1,000.

### 9.    Insider Trading in Nimble

109.    In early 2017, Nimble was engaged in nonpublic discussions to sell itself to Hewlett Packard Enterprise ("Hewlett Packard").

110.    The Investment Bank advised Nimble in connection with those discussions.

111.    In early November 2016, Nimble contacted representatives of the Investment Bank about a possible transaction with Hewlett Packard.

112.    By at least November 11, 2016, employees of the Investment Bank's San Francisco office were aware of the potential transaction.  Employees of the Investment Bank participated in various meetings and discussions relating to the potential transaction no later than November 14,

2016 and Nimble formally retained the Investment Bank on or about February 2, 2017.

113.    Between November 2016 and February 2017, Nimble and Hewlett Packard entered into a confidentiality agreement and employees of the Investment Bank participated in various meetings and discussions with Nimble, Hewlett Packard, and other potential acquirers.

114.    While in possession of material nonpublic information about the potential Nimble transaction, Jung, directly or indirectly, purchased or directed others to purchase Nimble securities in the Hwang Account.

115.    On the morning of February 6, 2017, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.  Later that afternoon, the Hwang Account purchased 1,160 shares of Nimble stock.

116.    On March 7, 2017, Nimble announced that it was being acquired by Hewlett Packard through a tender offer, and Nimble's stock price increased by nearly 47% after the announcement.

117.    On the morning of March 9, 2017, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.  Later that afternoon, the Hwang Account sold its Nimble stock for profits of over approximately $4,500.

**10.    Insider Trading in Gigamon**

118.    In spring 2017, Gigamon was in nonpublic discussions to sell itself.  The Investment Bank first began advising Gigamon in June 2016 regarding interest Gigamon had received from potential acquirers.  By at least June 22, 2016, employees of the Investment Bank's San Francisco office were aware of the potential acquisition of Gigamon.

119.    Between September 2016 and February 2017, acquisition discussions were put on hold.

120.    Between March 14 and May 22, 2017, employees of the Investment Bank made various presentations to Gigamon's management team or board of directors relating to a potential

acquisition, including advising on interest Gigamon received from a potential acquirer in April 2017.

121. While in possession of material nonpublic information about the potential Gigamon transaction, Jung, directly or indirectly, purchased or directed others to purchase Gigamon securities in the Hwang Account.

122. On the morning of May 24, 2017, the Hwang Account purchased 260 shares of Gigamon stock. Later that morning, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.

123. On June 2, 2017, a newspaper reported that Gigamon was preparing to hold talks with potential acquirers and had hired the Investment Bank. After the article was published, Gigamon's stock price increased by 9%.

124. As of June 5, 2017, the first trading day following the article, the Hwang Account's profit on its Gigamon stock was approximately $1,200.

**11.    Insider Trading in CA**

125. In spring 2017, CA was engaged in nonpublic discussions to sell itself or merge with another company.

126. Beginning in at least late-April 2017, Golden Gate Capital LP ("Golden Gate") contacted the Investment Bank about a potential transaction with CA. Employees of the Investment Bank's San Francisco office were aware of the potential transaction by at least April 27, 2017, and participated in meetings to discuss the potential transaction with Golden Gate and Bain Capital, LP ("Bain") by at least May 19, 2017.

127. While in possession of material nonpublic information about the potential CA transaction, Jung, directly or indirectly, purchased or directed others to purchase CA securities in the Hwang Account.

128.    On the morning of May 30, 2017, the Hwang Account bought 30 out-of-the-money CA call options set to expire in July 2017, as well as 640 shares of CA common stock.  Later that morning, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.

129.    On the evening of June 20, 2017, a newspaper reported that Golden Gate and Bain were exploring a merger between a company they owned, BMC Software, Inc., and CA.  After the report, CA's stock price increased by over 13%.

130.    On June 21 and July 11, 2017, the Hwang Account sold 30 of its CA call options for a profit.  On the morning of June 21, 2017, prior to the sales, Jung logged in to the Hwang Account using IP address 71.145.208.86 that was registered to him.

131.    On July 14, 2017, the Hwang Account bought 15 out-of-the-money CA call options of a different series with a higher strike price than the ones sold on June 21 and July 11, 2017.

132.    On July 27, 2017, public reports indicated that talks in pursuit of a merger between CA and BMC Software had ended without a deal, and CA's stock price dipped by approximately 10%.

133.    On the morning of July 27, 2017, the Hwang Account sold the remainder of its CA holdings for a profit.  Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account before and after the sales.  In total, the Hwang Account's trading in CA securities generated profits of approximately $13,000.

**12.    Insider Trading in WebMD**

134.    In spring 2017, WebMD was engaged in nonpublic discussions to sell itself. The Investment Bank advised a company exploring a potential leveraged buyout of WebMD.  The potential acquirer first contacted the Investment Bank about the proposed transaction on or about May 24, 2017.  At least one employee of the Investment Bank's San Francisco office was aware of

the potential transaction by that date.

135.    Between late-May 2017 and July 2017, the Investment Bank communicated with the potential acquirer and participated in a due diligence call concerning the potential transaction.  The potential acquirer that the Investment Bank was advising submitted a non-binding offer to acquire WebMD on or about July 21, 2017.  During the same time period, WebMD also solicited offers from other potential acquirers.

136.    While in possession of material nonpublic information about the potential WebMD transaction, Jung, directly or indirectly, purchased or directed others to purchase WebMD securities in the Hwang Account.

137.    The morning of June 29, 2017, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.  Later that morning, the Hwang Account purchased 6 out-of-the-money WebMD call options set to expire in August 2017 and 250 shares of WebMD common stock.

138.    On the morning of July 24, 2017, WebMD announced its acquisition through a tender offer by Internet Brands, Inc. (a company that had made a competing bid to acquire WebMD).  After the announcement, WebMD's stock price increased by nearly 20%.

139.    Also on the morning of July 24, Jung, using IP address 71.145.208.86 that was registered to him, logged in to the Hwang Account.  Later that morning, the Hwang Account sold its WebMD stock and call options for profits of approximately $3,800.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(Against Defendant Jung)**

140.    The SEC realleges and incorporates by reference paragraphs 1 through 139 above.

141.    At the time that Jung, directly or indirectly, placed, directed, or caused others to place trades in the Hwang Account as alleged above, he was in possession of material nonpublic information about potential corporate transactions that he obtained because of his employment with the Investment Bank.

142.    The Investment Bank treated information about these transactions as confidential, including through policies and procedures designed to protect such information and to prohibit its employees from trading on such information.  Specifically, Jung was prohibited, by the Investment Bank's internal compliance procedures, from trading on the basis of material nonpublic information and trading in undisclosed, outside accounts.

143.    Jung knew or was reckless in not knowing that the information he traded on was material and nonpublic, and that he owed the Investment Bank, its clients, and/or its clients' shareholders a fiduciary duty, or obligations arising from a similar relationship of trust or confidence, to keep the information confidential, and to refrain from trading on it or tipping others to trade.

144.    Jung breached a fiduciary duty, or a similar duty of trust and confidence to the Investment Bank, its clients, and/or its clients' shareholders, by trading or directing others to trade for his own benefit on the basis of material nonpublic information he obtained through his employment with the Investment Bank.

145.    By engaging in the conduct described above, defendant Jung directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

146.    By engaging in the conduct described above, Jung violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Fraud in Connection with a Tender Offer
### Violations of Sections 14(e) of the Exchange Act and Rule 14e-3 Thereunder
### (Against Defendant Jung)

147.    The SEC realleges and incorporates by reference paragraphs 1 through 146 above.

148.    The corporate transactions involving WebMD, Nimble, NXP, and Fairchild were each structured as tender offers.

149.    Jung obtained material nonpublic information about the contemplated tender offer transactions from his employer, the Investment Bank.

150.    Jung knew or had reason to know that this information was nonpublic, and that he had acquired it, directly or indirectly, from the offering person, the issuer of the securities sought or to be sought by such tender offer, and/or any officer, director, partner, employee, or other person acting on behalf of either the offering person or the issuer.

151.    Jung, directly or indirectly, placed, directed, or caused others to trade the securities of WebMD, Nimble, NXP, and Fairchild in the Hwang Account after substantial steps had been taken to commence tender offers for the shares of these companies and before the tender offers had been publicly announced.

152.    By engaging in the foregoing conduct, Jung violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)], and Rule 14e-3

thereunder [17 C.F.R. § 240.14e-3].

## **THIRD CLAIM FOR RELIEF**

### **Unjust Enrichment**

### **(Against Relief Defendant Hwang)**

153.    The SEC realleges and incorporates by reference paragraphs 1 through 152 above.

154.    Jung, directly or indirectly, placed, directed or caused others to place illegal trades in the Hwang Account as alleged above.

155.    Hwang has record ownership of the Hwang Account.

156.    The Hwang Account holds the ill-gotten gains from unlawful trades alleged in this Complaint.

157.    Hwang has no legitimate claim to these ill-gotten gains, which represent proceeds of the fraud alleged above, and it is not just, equitable, or conscionable for him to retain the ill-gotten gains.

158.    Accordingly, Hwang is liable as a relief defendant for unjust enrichment and must disgorge the ill-gotten gains in the Hwang Account.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Jung committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Jung, and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 10(b) and

14(e) of the Exchange Act [15 U.S.C. § 78j(b) and 15 U.S.C. § 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.14e-3].

### III.

Order Jung to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains from the conduct alleged in this Complaint, including illicit profits from trades made in the Hwang Account.

### IV.

Order Jung to pay civil penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### V.

Order Hwang to disgorge all trading profits and other ill-gotten gains to which he does not have a legitimate claim that he received as a result of the conduct alleged in this Complaint, together with prejudgment interest thereon.

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: May 31, 2018

JOSEPH G. SANSONE
sansonej@sec.gov
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0517 (Sansone)

GARY Y. LEUNG*
leungg@sec.gov
MEGAN M. BERGSTROM*
bergstromm@sec.gov
Securities and Exchange Commission
444 South Flower Street
Los Angeles, CA 90071
(323) 965-3213 (Leung)

*Not admitted in SDNY, *pro hac vice* application to be filed.